**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

**Case No. 6:18-cv-01851-PGB-TBS**

| | | |
|---|---|---|
| **BRUCE WRIGHT, JORGE VALDES,** *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | **PUTATIVE CLASS ACTION** |
| v. | ) ) | |
| **EXP REALTY, LLC,** a Washington company, | ) ) ) | |
| Defendant. | ) | |

_____

**DEFENDANT EXP REALTY LLC'S OPPOSITION TO PLAINTIFF'S MOTION TO
CERTIFY CLASS AND APPOINT CLASS COUNSEL**

## I.    <u>INTRODUCTION</u>

Plaintiff Edwin Diaz[1] seeks to certify a fractured class of individuals that received calls from independent non-parties using different technology, in different manners, to phone numbers obtained from different sources and under different circumstances. These varying circumstances impact the merits of each class member's claim and renders each subject to individualized proof. This lack of commonality is clear from the class definition itself, and becomes even more apparent upon consideration of the sparse evidentiary record supporting the motion.

First, class members did not receive calls from the same technology or in the same manner. Rather, by definition, class members received calls from two different platforms and in multiple modes. Similarly, by definition, class members received calls from multiple lead suppliers who, in turn, supplied numbers from multiple sources. Moreover, non-party realtors obtained consent from multiple sources, including through direct interactions with consumers on their own websites, personal referrals, and in response to inquiries from various forms of advertising. Plaintiff's muddled classes include individuals that received calls— both consented and non-consented, both manual and autodialed—without explanation as to how evidence of the experience of any particular class member bears on the claims of any other.  As such, suitable evidence will need to be introduced on each discrete pocket of the class and commonality does not exist.

Matters are somehow even worse with respect to vicarious liability. Certification is properly denied in TCPA cases involving realtors given the variance in control and supervision exercised by individual brokers. See *Chinitz v. Nrt W.*, Case No. 18-cv-06100-NC, 2019 U.S. Dist. LEXIS 148699 (N.D. Cal. Aug. 30, 2019). To avoid these individualized issues, Plaintiff contends that eXp "ratified" the actions of non-party realtors. But to show ratification Plaintiff must prove

---

[1] Although the Amended Complaint (Dkt. No. 30) was filed on behalf of three individual plaintiffs the class certification motion was filed solely on behalf of Edwin Diaz.

knowledge of misconduct by these realtors.   Yet Plaintiff has pointed to zero evidence of knowledge on eXp's part that any realtor actually violated the law.   Indeed, the non-party realtors agreed to operate lawfully and there is no evidence eXp was ever advised that violations were taking place. Even if such knowledge might be shown—and it cannot be— eXp only ratified those specific illegal calls that it accepted benefit from. Plaintiff has offered no explanation as to how he can prove benefit to eXp from any particular call, other than on individualized evidence.

The absence of commonality dooms Plaintiff's certification bid, but additional flaws are apparent in the motion. Plaintiff's Motion fails to mention the Eleventh Circuit Court of Appeal's critical new ruling in *Hanna*[2] or the even more recent ruling in *Cordoba*.[3] Yet binding precedent now compels this court to consider, in assessing predominance, whether any particular call violating the TCPA—if there were any—actually caused concrete harm before allowing a class member to recover statutory damages.   Other flaws also exist: Plaintiff is not typical of his DNC class because he used his cell phone number for business purposes; yet the DNC claim only exists in favor of residential cell phone users. Plaintiff cannot demonstrate ascertainability because the identity of class members can only be achieved through cumbersome reviews of third-party records that may or may not even exist. Moreover, Plaintiff is likely not even adequate to represent the class given his complete ignorance of the class action process and duties owed to class members.

In short, Plaintiff has chosen to bite off more than he can chew. Class members received calls under a wide variety of circumstances from realtors acting independently and using different lead sources and calling technology. There is simply nothing common across the class allowing resolution of a critical merits issue "in one stroke."

---

[2] *Salcedo v. Hanna*, No. 17-14077, 2019 U.S. App. LEXIS 25967 (11th Cir. Aug. 28, 2019).
[3] *Cordoba v. DIRECTV, LLC*, No. 18-12077, 2019 U.S. App. LEXIS 34146, at *2 (11th Cir. Nov. 15, 2019).

## II.    RELEVANT FACTUAL BACKGROUND

### A.    eXp and Non-Party Realtors

eXp maintains a network of over 22,000 independent realtors that serve as agents for individual consumers. (Dkt. No. 59-1, ¶ 4.) Like all franchisees, these non-party realtors use the eXp name but are not subject to the day-to-day control of eXp. (Dkt. No. 59-1, ¶¶ 8-11, 17-22.) Nonetheless, each non-party realtor is subject to varying levels of supervision by a designated broker in each state and Washington D.C. *See.* Nuth Depo., at p. 59 ("[T]he only oversight that the brokers do is to make sure that [the non-party agents] [are] following state policy dictated and mandated by the State Department of Licensing.").

Without question, however, the non-party realtors operate independently, and—for instance—eXp does not directly supervise any agent's telemarketing activity. (Dkt. No. 59-1, ¶ 18.) That said, these non-parties must agree to operate lawfully and ethically to remain a part of eXp's network.  (Dkt. No. 59-1, ¶ 20.)

### B. Non-Party Realtors Used Different Lead Providers and Varying Lead Sources to Make Calls to Class Members in Different Modes

Non-party realtors obtained phone numbers to call from a vast array of sources.  *See*, *e.g.*, Supp. Nuth Decl., at ¶ 10.

For instance, realtors obtained phone numbers via inquiries made by consumers on websites. *See* Supp. Nuth Decl., at ¶¶ 10-15 (explaining use of real estate websites by non-party realtors generally and, specifically, the non-party realtors whom allegedly contacted Plaintiff Diaz); *accord* Nuth Depo., at pp. 22, 39-40 (testifying that independent realtors used kvCORE and the "Make It Rain" program to develop and post advertisements on outside services, such as Facebook, to attract consumers through a "pay-per-click" advertising campaign that directs them to the realtor's website). These websites are specific to each agent and contain different

disclosures. *See* (Supp. Nuth Dec. ¶¶ 11-15.) But the websites will almost always include a consent disclosure advising consumers that by providing their phone numbers the consumer is agreeing to be called—including via automated technology. *See* (Supp. Nuth Dec. ¶¶ 11-15.); *accord* Freda Decl., at ¶¶ 4-10 (discussing the TCPA disclosures on his two (2) real estate websites).

By definition, non-party Realtors used Mojo, Landvoice, or Vulcan7 to obtain phone numbers to be called, among myriad other sources of phone numbers. The Certification Motion does not identify the source of numbers supplied by these lead providers or explain why calling numbers from these sources might be illegal. Without question, however, the numbers supplied by Mojo, Landvoice, and Vulcan7 came from multiple sources. Farr Depo., at pp. 47-50, Ex. 8; Jones Aff., at ¶¶ 4, 7, 11-12, 17-18, 29.  And, importantly, just because a number was supplied by one lead source does not mean that the agent did not separately obtain that same phone number from a consenting consumer through its own channel. *See*, *e.g.*, Farr Depo., at pp. 62-64.

eXp did not, in the ordinary course of its business, have knowledge of what lead sources were being used by any specific non-party realtor or how those leads were being called. (Dkt. No. 59-1, ¶¶ 11, 17-19.); *accord* Supp. Nuth Decl., at ¶¶ 16-17; Nuth Depo., at pp. 27, 30 (testifying that agents are free to conduct their business as they wish, and that eXp is not aware of all the methods by which realtors engage in prospecting clients). It does, of course, advise agents to follow the law. (Dkt. No. 59-1, ¶ 20.); *see also* Supp. Nuth Decl., at ¶ 8.

**C. Non-Party Realtors Used Different Technology in Different Modes to Make Calls**

By definition, class members received calls from either a Mojo Power Dialer or a Vulcan7 Power Dialer.  These dialers can operate in different modes. *See* Jones Aff. ¶¶ 20-28 (describing different modes in which calls can be placed). These include manually launched calls. *Id.* ¶ 21 ("Once the Subscriber is the Phone Application, he or she can place calls by clicking on the

individual contacts selected for that session."); Mangold Decl., at ¶¶ 5-6. Plaintiff has failed to demonstrate how calls made in each one of these modes can be determined from the class data. It is also not possible to determine whether a pre-recorded call is actually played to a consumer based upon the class data. *See*, *e.g.*, Woolfson Expert Report, at ¶ 112 ("[Plaintiff's expert] does not identify or define any method that could be used to reliably identify . . . which calls resulted in the playing of a pre-recorded message . . . .").

eXp did not, in the ordinary course of its business, have knowledge of what dialing equipment was being used by any specific non-party realtor, what modes those calls were being made in, or to whom those calls were being made. (Supp. Nuth Dec. ¶¶ 17-18).

**D.  The Non-Party Realtors that Called Plaintiff Had Clean Records with eXp**

Plaintiff contends that two (2) non-party realtors called him without consent – Matthew Freda and Linda Mieczkowski. Notably, however, these individuals are not parties to this action and have not been called upon to defend themselves in this case. Moreover, eXp does not have any records indicating that either Linda Mieczkowski or Matthew Freda have ever violated the TCPA. *See* Supp. Nuth Decl., at ¶ 22.

**E. Plaintiff Has Failed To Demonstrate Adequate Data to Identify Class Members**

Plaintiff seeks to certify a class of *all* individuals called by *any* non-party eXp-affiliated realtor using certain dialers and sourced from certain lead providers. Yet Plaintiff has identified only a sliver of the evidence needed to identify class members: Mojo lead lists and dialing records relevant to only one of over 22,000 non-party realtors, Linda Mieckowski, and limited call logs from Vulcan 7. (Dkt. No. 66, p. 2.) And even that data cannot actually be used to identify individuals. Woolfson Expert Rpt. ¶ 7. eXp does not maintain any data regarding outbound calls

attempted by these non-party realtors. (Dkt. No. 59-1, ¶ 18).  To eXp's knowledge there is no way to comprehensively identify class member phone numbers. (Supp. Nuth Dec. ¶ 19).

### F. Plaintiff Used His Cell Phone For Business Purposes

Plaintiff received phone calls on cell phone number 646-919-XXXX (the "646-919 Number"). [Doc. No. 68-20] at ¶ 4 (identifying the 646-919 Number as the cellular telephone number at issue with respect to Plaintiff Diaz's individual claims).  Plaintiff uses that phone number for business purposes. Diaz Depo., at pp. 8-12 (testifying that he uses the 646-919 Number in connection with his chauffeur and Uber businesses, and specifying that when "a client comes out, they get into my vehicle . . . [and] if they like my services, they would ask me for my phone number so they can use me . . . in the future").

### III.   PLAINTIFF HAS PREJUDICED EXP BY CHANGING HIS CLASS DEFINITION AFTER THE DEADLINE TO AMEND PLEADINGS HAS RUN

Plaintiff has significantly modified his class definition from the amended complaint. This is true although eXp pointed out deficiencies in that class definition and sought to strike the definition. (Dkt. No. 48.) Despite opposing that motion, Plaintiff now adopts a different class definition—giving eXp just a month to gather the necessary evidence needed to oppose certification. This is prejudicial sandbagging that should not be tolerated. See *Costelo v. Chertoff*, 258 F.R.D. 600, 604-05 (C.D. Cal. 2009) ("The Court is bound by class definitions provided in the complaint and, absent an amended complaint, will not consider certification beyond it.")

The original class definitions looked at how consent was obtained to contact the named Plaintiffs. Yet the new definitions look to certify a class based solely upon phone numbers having been provided by three particular lead providers. These definitions differ entirely in their *theory* – the original definitions focused on commonality of *consent* whereas the new definitions focus merely on their having been supplied by a lead provider—and are actually much broader than the

original class, requiring rapid discovery efforts to obtain needed information.  Again, this sort of target moving cannot be permitted where it prejudices a defendant. *Columbus Drywall & Insulation, Inc. v. Masco Corp*., 258 F.R.D. 545, 552 (N.D. Ga. 2007) ("The Court concludes that any ruling on plaintiffs' amended class definition, given this chronology of events, presents grave prejudice to defendants, including a potential due process violation."); *Jacobs v. Quicken Loans, Inc*., No. 15-81386-CIV, 2017 U.S. Dist. LEXIS 176469, at *11 (S.D. Fla. Oct. 19, 2017) ("To the extent Plaintiff seeks to change his class definition on the basis of the arguments raised by Defendant, the Court finds that permitting this would prejudice Defendant who conducted discovery and provided briefing based on the current class definition."); *see also Belmont v. BP Am. Prod. Co*., No. 13-cv-0063-F, 2014 U.S. Dist. LEXIS 192008, *8-9 (D. Wyo. Oct. 16, 2014) (denying leave to amend complaint where proposed amendments change the class definition because it "causes prejudice since Defendant has been preparing for the class certification issue based on the definition in the Complaint"); *Glazer v. Chase Home Fin., LLC,* No. 1:09CV1262, 2017 U.S. Dist. LEXIS 49339, *6-7 (N.D. Ohio Mar. 31, 2017 ("Because Defendants never had the opportunity to challenge the new class definitions and allegations they are necessarily prejudiced by it.").

## IV. PLAINTIFF HAS FAILED TO MEET HIS EVIDENTIARY BURDEN OF ESTABLISHING THIS CASE CAN BE CERTIFIED UNDER RULE 23

### A. Plaintiff's Motion Fails to Demonstrate the Basic Rule 23(a) Factors Are Met

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-1 (1979)). To warrant certification, a plaintiff must demonstrate, at least, the following: i) that the class is sufficiently numerous to make joinder

unwieldy;[4] ii) that the claims of class members are subject to joint resolution by common questions of law or fact; iii) that Plaintiff has claims typical of all class members; and iv) that Plaintiff and his counsel are otherwise adequate to represent the class. *Dukes*, 564 U.S. at 348; *see also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).

Plaintiff bears the burden on each of these elements. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233-34 (11th Cir. 2015). That burden can only be met by affirmative evidence, not speculation or surmise. *Id.* at 1234 ("The party seeking class certification has a burden of *proof*, not a burden of pleading . . . . He "'must affirmatively demonstrate his compliance' with Rule 23" by proving that the requirements are '*in fact*' satisfied.")

### 1. Plaintiff Has Failed to Demonstrate Even Basic Rule 23(a) Commonality As Non-Party Realtors Made Various Calls to Various Class Members for Various Purposes Under Various Circumstances

The 23(a)(2) commonality prong requires that class member claims turn on a common issue that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Not even a single common issue exists here.

Plaintiff's Motion does not meaningfully explain why class members are in a common position. Tellingly, the Motion does *not* contend that consent can be determined on a class wide basis. Rather Plaintiff focuses on supposed common proof of secondary issues such as ATDS usage and vicarious liability. But his identified common issues are not common at all.

For instance, he asserts that "[w]hether the Mojo Power Dialer is an autodialer"[5] and "[w]hether the Vulcan7 Power Dialer is an autodialer" are common issues, but that is plainly not

---

[4] eXp does not dispute that the class is sufficiently numerous as defined; as explained below however, Plaintiff has introduced no evidence that *any* class member actually received illegal calls and were thereby harmed.

[5] Notably the TCPA does not regulate the use of an "autodialer"—it regulates the use of automated telephone dialing systems. eXp will treat the motion as if it references such equipment when it states "autodialer."

so—some class members received calls from one dialer or the other and not both. So, for instance, proof that Mojo is an ATDS inures to the benefit of some, but not all, class members. This is, therefore, patently not a "common" issue across the members of the autodialed no consent class.

The issue is the same with the pre-recorded class. Plaintiff identifies "[w]hether eXp realtors made prerecorded voice calls to members of the Prerecorded No Consent Class." But he overlooks that two different systems were used to communicate with class members. Evidence that one system's voicemail process constitutes a "pre-recorded" voice for TCPA purposes is not dispositive on the issue as to the other system.

Commonality really starts to break down in assessing vicarious liability. Plaintiff asserts that "[w]hether eXp is vicariously liable under a ratification theory for eXp realtors' TCPA violations" but he has failed to demonstrate how that is so. It is patently the case that eXp might be vicariously liable for the acts of some but not all agents—such as non-party realtors that its brokers more-directly controlled, or those, if any, whose activities were directly known to eXp management. As a factual matter, however, it is undisputed that non-party realtors conducted themselves independently and some did, and some did not, use lead lists, whereas others used website-generated leads that included specific consent disclosures or relied on referrals from their "sphere of influence," and still others – many others – make no outbound marketing calls at all. (Dkt. No. 59-1, ¶¶ 12-13.) It is therefore impossible to determine on a classwide basis that eXp knew some, all, or any specific realtor was calling numbers obtained solely from unconsented sources using automated technology. (Supp. Nuth Dec. ¶¶ 19-20.) Notably, Plaintiff has failed to so much as identify *which* of eXp's approximately 22,000 non-party realtors are purportedly responsible for calls to class members to begin with—how, then, can eXp's responsibility for this conduct be assessed? Similarly, some brokers purported to assert enhanced control over non-party

realtors—such as the Texas broker that purported to require non-party realtors to cease calling certain leads—whereas Plaintiff has failed to demonstrate a classwide right to control non-party realtors in identical, or similar, fashion exists where no less than 51 "designated brokers" independently supervise tens of thousands of non-party realtors.

*Chinitz v. Nrt W.*, Case No. 18-cv-06100-NC, 2019 U.S. Dist. LEXIS 148699 (N.D. Cal. Aug. 30, 2019) is directly on point. There it was held that a TCPA class action against residential brokerage company Caldwell Banker was not certifiable because of the varying degree of control asserted by its broker agents. The Court held that "dissimilarities in the proposed class—i.e., the fact that each class member was called by different [] associates—has the potential to impede the generation of common answers… [Defendant] may exert different levels of supervisory control over its associates, such that it is vicariously liable for the actions of some associates, but not others." *Chintz* at *13. Crucially this result was driven by the overbreadth of the class: "*Chinitz* seeks to hold [Defendant] responsible for the actions of every one of [Defendant's] associates. Absent a preponderance of evidence that [Defendant's] relationship with its associates can be determined across the board, Chinitz has not satisfied the commonality requirement." *Id.*

As just shown, those precise similarities exist in this suit.[6] So commonality does not exist.[7]

---

[6] For that reason, Plaintiff's bland assertion that "whether eXp's conduct was willful and knowing" is a common issue too falls flat. To show willfulness Plaintiff must demonstrate that a Defendant *knew* it was making a call to a specific Plaintiff without consent. *See, e.g.*, *Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1107 (11th Cir. 2015). Again Plaintiff has failed to demonstrate that eXp was aware of any specific TCPA violations, much less that eXp was equally and commonly aware of *every* individual TCPA violation, if any, impacting class members.

[7] Notably, Plaintiff has not identified a single common issue unique to his DNC subclass members. He has not, for instance, demonstrated how Plaintiff can demonstrate that class members were called on a residential cell phone or the *purpose* of each call using common evidence. As it is Plaintiff's burden to demonstrate commonality of each of his subclasses, he should be deemed to have abandoned this class. *See, e.g.*, *Murray v. Auslander*, 244 F.3d 807, 810 (11th Cir. 2001) ("In order to obtain class certification, plaintiffs first must satisfy the prerequisite[] of . . . commonality . . . specified in Rule 23(a)."); *Dyer v. Publix Super Mkts., Inc.*, 2000 U.S. Dist. LEXIS 4455, at *8 (M.D. Fla. Mar. 21, 2000) ("Rule 23(a)(2) requires that Plaintiffs establish that questions of law or fact common to the class exist.").

### 2.    Plaintiff Has Failed to Demonstrate He is Typical of the Large Majority of His Chosen Classes

Typicality turns on whether "the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Williams v. Mohawk Industries, Inc*., 568 F.3d 1350, 1357 (11th Cir. 2009). "Typicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1322 (11th Cir. 2008). A TCPA class representative cannot represent class members that received texts by virtue of providing their number to a caller in a different method than the named Plaintiff. *See Esparza v. Smartpay Leasing*, 2019 U.S. Dist. LEXIS 94545 (N.D. Cal. June 6, 2019) (Plaintiff that did not encounter website disclosure that purportedly afforded consent cannot represent class of individuals that did).

Plaintiff asserts he is "typical" of class members because his claims "arise from the same legal theory" as those of other class members. He overlooks, however, that there is no "typical" class member because not every class member will have valid claims and that there are broad differences in the strength of claims by various class members. As Plaintiff insists he was called using an ATDS, for instance, his claim will differ markedly from those of class members that were called using the targeted platforms but only in a manual fashion. Indeed, there is an inherent hostility between the Plaintiff—who purports to have a much stronger claim—and those members of the class whose claims are more tenuous due to consent and ATDS issues. *See*, *e.g.*, *Fennell v. Navient Sols., LLC*, No. 6:17-cv-2083-Orl-37DCI, 2019 U.S. Dist. LEXIS 141194, at *16 (M.D. Fla. June 13, 2019) ("Fennell's claims are not typical of the proposed class she seeks to represent because of the potentially different use of the autodial versus manual dial feature to complete the calls. . . . Thus, because Fennell's claim may differ from many class members with respect to a

central element of a TCPA claim—receiving a call from an ATDS—her claims are not typical of the proposed class and she failed to satisfy the Rule 23 typicality requirement.").

While Plaintiff would be typical of class members who have a claim of the same tenor of his own purported claim—i.e. those who received a true "cold call" attempted in automated fashion—Plaintiff has failed to define such a class. Indeed, even the realtors who place calls through the systems at issue here do so from leads obtained through a variety of sources, and placed calls in a variety of manners, underscoring Plaintiff's atypicality to represent members of the Autodialer class. *See*, *e.g.*, Farr Depo., at pp. 62-64 (although a particular lead source may contain unconsented leads, individual realtors may have a legal basis to contact those unconsented leads based on that individual realtor's "sphere of influence"); Jones Aff. ¶¶ 20-21 (describing different calling modes of Vulcan 7); Mangold Aff. ¶ 5 (describing the manual mode of a Mojo dialer).

Then again, Diaz cannot recover against eXp because it did not accept any benefit from the calls to him. But Plaintiff's theory of recovery on the Autodialer and Prerecorded Subclasses turns entirely on ratification. Without acceptance of benefit there can be no ratification. In re Dish Network, 28 FCC Rec'd 6574, ¶ 34. So Plaintiff's claim is not typical of those class members who have a valid theory of recovery against eXp.

Plaintiff's tension with the DNC class is even more profound. Indeed, he is not a member of the class at all. DNC class members received calls on a cell phone use for residential purposes. But Plaintiff uses his cell phone for business purposes. *See* Diaz Depo., at pp. 4, 7-12, *supra*. So he cannot represent that portion of the class. *See*, *e.g.*, *Shelton v. Target Advance LLC*, No. 18-2070, 2019 U.S. Dist. LEXIS 64713, at *17 (E.D. Pa. Apr. 16, 2019) ("[B]ecause Plaintiff held the Phone Number out to the world as a business phone number, he could not register it on the National Do Not Call Registry for purposes of avoiding business-to-business calls[.]").

### 3.      Plaintiff Is Not Adequate to Represent the Class

Certification is properly denied where class representatives demonstrate disinterest in the case and "cede[] control" to counsel entirely. *See Welling v. Alexy (In re Cirrus Logic Sec.)*, 155 F.R.D. 654, 659 (N.D. Cal. 1994) (finding in addition to the fact that the class representative "ceded control" to counsel, his background as a repeat securities class action plaintiff "raises serious questions regarding his suitability"); *Howard Gunty Profit Sharing Plan v. Superior Court*, 88 Cal. App. 4th 572, 577-78, 105 Cal. Rptr. 2d 896 (Cal. Ct. App. 2001) (holding that the purported class representative had inadequate knowledge and weak credibility). Additionally, a plaintiff cannot represent a class if there are defenses unique to his or her claim that are not common to the class. *See, e.g., Roseman Profit Sharing Plan v. Sports & Rec.*, 165 F.R.D. 108, 110-111 (M.D. Fla. Feb. 20, 1996) (holding that defenses unique to the named plaintiff are relevant for class certification decisions).

Plaintiff does not even a minimal standard of adequacy, as he knows nothing about the case, was entirely unfamiliar with significant documents in the case, and did not review or approve critical documents – including the Motion for Certification – until one day before his deposition, long after they were filed. *See, e.g.*, Diaz Depo., at pp. 25-27, Ex. 2 (testifying that he does not "recall" seeing the Amended Class Action Complaint before it was filed); Diaz Depo., at pp. 27-30, Exs. 3, 4 & 5 (testifying that he had not reviewed eXp's Motion for Summary Judgment, Plaintiff's Opposition to eXp's Motion for Summary Judgment, or Plaintiff's Motion for Class Certification until the day prior to his deposition and that he had no understanding of the documents outside of his communications with counsel); Diaz Depo., at pp. 38-39, Ex. 6 (testifying that he had not seen the responses contained in Plaintiff Diaz's responses to eXp's First Request for Production of Documents until the day before his deposition); Diaz Depo., at pp. 40-41, Ex. 7.

Plaintiff is also lacking in even the most basic awareness of the duties of a class representative. *See, e.g.*, Diaz Depo., at p. 42 ("Q. . . . For the individuals that are not actually named in the lawsuit as plaintiffs, do you have any duties to them? . . . THE WITNESS: No. I mean, not that I'm aware of."). In fact, he believed that his only duty was to give a deposition, and testified explicitly that he had no other duties as a class representative. Diaz Depo., at pp. 21, 31-32 (testifying that the "duties of a class representative" are "[e]xactly what [he is] doing right now" – i.e., giving a deposition regarding his individual desire to make alleged calls to his 646-919 Number "from a number of different companies" stop – and, when asked if he has an understanding of his duties "outside of giving a deposition," Plaintiff Diaz responded, unequivocally, "No").

Plaintiff has plainly turned the control of this case over to his lawyers, meaning that he is not an adequate to represent the class. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987) (class certification properly denied "where the class representatives had so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.").

## B.     Plaintiff Has Failed to Meet the Rule 23(b)(3) Requirements of Predominance, Superiority and Ascertainability

In addition to the Rule 23(a) requirements, in order to certify a damages class[8] Plaintiff must also demonstrate predominance, superiority and ascertainability. *See* Fed. R. Civ. P. 23(b)(3); *Walewski v. ZeniMax Media, Inc.*, 2012 U.S. Dist. LEXIS 33181, at *2 (M.D. Fla. Jan. 30, 2012). Plaintiff bears the burden of proof on these issues as well. *E.g. Nesbit v. Unisys Corp.*, No. 2:05-cv-528-MEF (WO), 2006 U.S. Dist. LEXIS 61043, at *18-19 (M.D. Ala. Aug. 25, 2006).

---

[8]TCPA cases are primarily about damages. Thus courts may properly strike requests for injunction only TCPA classes. *Cholly v. Uptain Grp., Inc.*, No. 15 C 5030, 2015 U.S. Dist. LEXIS 171415, at *8-9 (N.D. Ill. Dec. 22, 2015). Here, however, Plaintiff seeks only to certify his class under Rule 23(b)(3).

1.     **Plaintiff Has Failed To Demonstrate That Common Issues Predominate Over the Extensive Individualized Issues Present Here**

To certify a Rule 23(b)(3) class, common issues "must predominate over those issues that are subject only to individualized proof." *Babineau v. Fed. Exp. Corp*., 576 F.3d 1183, 1191 (11th Cir. 2009). "Common issues will not predominate over individual questions if, 'as a practical matter, the resolution of [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues.'" *Id*. at 1191 (quoting *Andrews v. Am. Tel. & Tel. Co*., 95 F.3d 1014, 1023 (11th Cir. 1996)).

To determine whether common questions predominate, the Court is "called upon to examine the cause[] of action asserted in the complaint on behalf of the putative class." *Rutstein v. Avis Rent-A-Car Sys*., 211 F.3d 1228, 1234 (11th Cir. 2000). "Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." *Id*. (citing *Amchem Prods., Inc*., 521 U.S. at 623 ("[The predominance] inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy.")).

As shown above, there are literally no issues common to the classes as a whole. Even if commonality can be shown, however, there are four sets of individualized issues thwarting a finding of predominance: i) whether the class member consented to receive calls, directly or indirectly; ii) whether the calls at issue were made in a manner triggering statutory coverage; iii) whether eXp knew any particular call was illegal and yet accepted the benefit of the call; and iv) whether each class member subjectively wanted the call he or she received.

a.     **Individualized Review of the Purpose of Each Phone Call Is Necessary to Determine What Level of Consent is Needed**

Different levels of consent are needed to send different types of messages under the TCPA. To send informational messages a caller need only receive a phone number directly from the called

party. *Miller v. Ginny's Inc.*, 287 F. Supp. 3d 1324, 1328 (M.D. Fl. 2017), citing *Lawrence v. Bayview Loan Servicing, LLC*, 666 Fed. Appx. 875, 880 (11th Cir. 2016). For telemarketing messages, however, a caller must have express written consent. *See Edelsberg v. Vroom, Inc.*, No. 16-cv-62734, 2018 U.S. Dist. LEXIS 50420, at *8 (S.D. Fla. Mar. 27, 2018).

Plaintiff's Motion asserts that the calls at issue are "cold call" telemarketing calls. But that is not how the class is defined. Indeed, while Plaintiff argues that calls to class members were all "cold call" advertising he has presented no evidence that the purpose[9] and context surrounding the submission of *each* call[10] was uniform across the class so as to empower common adjudication.

Rather the class includes *any* call made by non-party realtors using certain sets of technology where the original source of the number was one of three lead providers. Yet non-party realtors commonly call individuals for purposes other than telemarketing, even if they originally obtained their phone number through a lead provider. *See*, *e.g.*, Supp. Nuth Decl., at ¶ 10; Farr Depo., at pp. 62-64.  For instance, a number supplied by a lead provider might have been called manually using a different system and then, only after the consumer signed up for a service with a non-party realtor, may have received calls to facilitate the delivery of information to facilitate a transaction or complete the service the customer has requested. (Supp. Nuth Dec. ¶ 20.). Such calls would not be telemarketing. *Newhart v. Quicken Loans Inc.*, No. 9:15-CV-81250, 2016 U.S. Dist. LEXIS 168721, at *9 (S.D. Fla. Oct. 12, 2016) ("Some calls were made in direct response to written and oral requests from borrowers. Such invited calls are not unsolicited telemarketing calls 'initiated' for the purpose of marketing a good or service."); *Blow v. Bijora, Inc.*, 855 F.3d 793,

---

[9]The regulations look at the caller's mental state. "[T]elemarketing" is "the initiation of a telephone call or message *for the purpose* of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12) (emphasis added).

[10]*Newhart v. Quicken Loans Inc.,* No. 9:15-CV-81250, 2016 U.S. Dist. LEXIS 168721, at *8 (S.D. Fla. Oct. 12, 2016) ("The FCC's regulation refers to the 'purpose' of each singular call [not]… an overall campaign.").

803 (7th Cir. 2017) ("persons who knowingly release their phone number have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary.")

> **b.   An Individual Assessment of Whether Each Class Member Provided Consent Will is Needed**

Once the finder of fact determines the purpose of each call it must determine whether an adequate level of consent was actually obtained to permit each individual phone call.

Each class member will have received a call on a phone number that was supplied to a non-party realtor by Mojo, Landvoice, or Vulcan7. Yet the class is not defined such that the non-party realtor received the number *exclusively* from one of these three sources. And non-party realtors have numerous sources of leads available to them—many of which will overlap with the leads supplied by Mojo, Landvoice, or Vulcan7. (Farr Dep. 62-64.)

More basically, the Certification Motion does not introduce evidence that numbers supplied by Mojo, Landvoice, or Vulcan7 can be treated monolithically on the issue of consent. The TCPA does not bar calls made to lists supplied by third-parties. *See*, *e.g.*, *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1123 (11th Cir. 2014) (recognizing that consent, for purposes of the TCPA, can be provided through third-party intermediaries); *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 345 (6th Cir. 2016) (same).Yet Plaintiff fails to demonstrate that all leads from all three providers come from the same sources or rely on the same disclosures for consent. It was Plaintiff burden to do so. Moreover, Plaintiff has introduced no evidence as to how the source of any specific lead can be tracked to any specific call by any specific realtor, much less how this matching exercise can be accomplished on a class wide basis. Yet at trial Plaintiff will be pressed to prove that every call made to every class member was made without the requisite level of consent. As numbers provided by Mojo, Landvoice, or Vulcan7 may be drawn from multiple

sources by these providers, and also overlap with numbers pulled from separate and consented sources used by non-party realtors, Plaintiff has simply not demonstrated how consent can be proven except by individualized evidence. So certification must be denied. *Gene & Gene*, 541 F.3d at 328-29.[11]

>  c.  **An Individual Assessment of How Each of the Calls Was Attempted—and the Result of Pre-Recorded Calls— Is Also Necessary**

On the record before the Court, class members received calls in at least three different modes from at least two different systems. Manually dialed calls using these systems – or calls made in other modes that do not meet the technical definition of an ATDS – would not be actionable under the TCPA, even if made without consent. *See* 47 U.S.C. § 227(b)(1)(A)(iii).  Pre-recorded calls using these systems are actionable only if a pre-recorded message actually played. *See*, *e.g.*, *Ybarra v. Dish Network, L.L.C.*, 807 F.3d 635, 641 (5th Cir. 2015) ("We hold that making a call in which a prerecorded voice might, but does not, play is not a violation of the TCPA. Instead, the prerecorded voice must 'speak' during the call."); Woolfson Expert Report, at ¶ 112 ("[Plaintiff's expert] does not identify or define any method that could be used to reliably identify . . . which calls resulted in the playing of a pre-recorded message . . . .").

Many non-party realtors are undoubtedly aware of TCPA restrictions , as their ICAs require them to be familiar with the federal Do Not Call Registry. (Dkt. No. 59-1, ¶ 20.) Presumably, therefore, these realtors are abiding their covenants to eXp and calling numbers lacking consent only using manual mode or via other technology that is not an ATDS. Nuth Depo., at pp. 26-27,

---

[11] The DNC class fails for the additional reason that calls made with an established business relationship do not trigger DNC claims. *Forney v. Hair Club For Men Ltd.*, No. CV 16-9640-R, 2017 U.S. Dist. LEXIS 214251, at *6 (C.D. Cal. June 26, 2017) ("One . . . exemption [to the National Do Not Call Registry] is the business relationship exception which allows a seller to call consumers . . . if the seller has an established business relationship with the consumer."). . Yet Plaintiff has failed to demonstrate how he would weed our class members that have such relationships with non-party realtors or eXp. Just because a number was supplied by a lead provided does not mean that a non-party realtor did not already have a relationship with that customer.

58, Ex. 7, p. 20 (see above); Nuth Depo., at p. 45, Ex. 3, p. 16 (see above); Nuth Depo., at pp. 56-

57, Ex. 7, p. 3 (see above). There is reason to infer, therefore, that every call made to class members

without consent was made manually. Plaintiff has offered no explanation as to how the inverse

may be proven on a classwide basis. Indeed Plaintiff has introduced no explanation as to how he

intends to prove the mode was the call was placed in at all.

As to prerecorded calls, class members cannot recover merely because a prerecorded call

was attempted. Instead a message must actually *play* to be actionable. *Ybarra*, 807 F.3d at 641.

Obviously individualized evidence—namely testimony from class members and/or recordings of

purported pre-recorded calls—will be necessary to identify actionable calls made using this

technology. This is in addition to the careful matching exercise needed to determine whether calls

were made without consent to begin with.

> **d.      An Individual Assessment of eXp's Potential Vicarious Liability for the Actions of Realtors Will Also Be Needed**

Plaintiff's theory of recovery against eXp is that eXp ratified purportedly illegal acts. As a

legal matter the theory must fail because there can be no ratification in the absence of an agency

relationship. See *Irwin v. Miami-Dade Cty. Pub. Schs*, No. 06-23029-CIV, 2008 U.S. Dist. LEXIS

65837, at *15 (S.D. Fla. July 30, 2008) ("A count brought under a theory of ratification requires a

principal-agent relationship."); *Kristensen v. Credit Payment Services Inc.*, 879 F. 3d 1010, 1014

(9th Cir. 2018) ("[w]hen an actor is not an agent and does not purport to be one," the doctrine of

ratification does not apply.) A showing of agency in a TCPA case, however, requires an extensive

review of up to ten different factors—including "direct supervision" of the phone calls at issue.

*Jones v. Royal Admin. Servcs.,* 866 F. 3d 1100, 1103 (9th Cir. 2017).

The *Jones* factors are plainly individualized in nature. For instance on the topic of control

a fact finder must assess whether eXp controlled the hours the telemarketers worked or set quotas

for the number of calls or sales the telemarketers had to make. *Jones* at 1106. The fact finder must assess the extent of "training and oversight" provided to particular agents— direct training and oversight is not enough to convert an independent contractor into an agent—to determine whether eXp "directly supervise[d] [the purported agent's] calls." *Ibid.* Plaintiff has presented no common evidence on these points. Indeed the only common evidence he does present—such as eXp paying a commission for sales, rather than for the time the realtors work— is a "strong indicator that the telemarketers were independent contractors." *Id.*

Even if ratification can exist without agency—and it cannot—Plaintiff has not demonstrated classwide proof of acceptance of benefit with knowledge of illegality. Critically, actual knowledge—not mere notice—of unlawful conduct is required. Restatement § 4.06, cmt. b. ("Ratification requires that the principal have actual knowledge of material facts, not notice . . . ."); *Legg v. Voice Media Grp., Inc.*, 20 F. Supp. 3d 1370, 1377-78 (S.D. Fla. 2014)(even where a Defendant plays a critical role in transmitting unlawful messages, there is no vicarious liability for ratification unless the Defendant actually *knew* the messages were unlawful and accepted the benefit anyway.)  And mere evidence that eXp knew non-party realtors were using lead lists or using automated technology is not sufficient to constitute actual knowledge or to impose a duty of investigation before accepting a benefit from sales. *E.g. Kristensen v. Credit Payment Servs. Inc.*, 2015 U.S. Dist. LEXIS 96036, at *8 (D. Nev. July 20, 2015)( "merely relying on the [defendants'] general knowledge that lead-generators use texting in this industry… cannot be enough, especially given that not all texting is prohibited. [Instead,] [r]atification requires the [defendants] to at least know of a red flag that would put them on notice of [its vendor's] unsolicited texting campaign.")

Here the best plaintiff can demonstrate is that eXp knew that some non-party realtors—he does not identify which—were using lead lists while some—he does not identify which—were

using technology that might be regulated by the TCPA. He has introduced *zero* evidence that eXp knew *any* of its agents had ever violated the statute by misusing either the lead lists or regulated technology, much less that it knew and approved of such conduct *every time* it happened.

Perhaps even more basically, eXp cannot be liable for a phone call unless it accepted a benefit from that call. *See* Restatement (Third) of Agency § 4.01, cmt. g ("A person . . . ratif[ies] an act . . . by receiving or retaining benefits it generates if the person has knowledge of material facts . . . ."). Yet obviously not every phone call resulted in a transaction—hence eXp categorically did not accept the benefit of every potentially illegal call made in this case. At best eXp accepted the benefit of calls that resulted in *actual sales*.[12]  This is the issue that most surely sinks Plaintiff's certification bid: to succeed at trial Plaintiff would have to prove—on a transaction by transaction basis—which phone calls to class members resulted in a successful sale. *Accord* Restatement (Third) of Agency § 4.07, cmt. c. ("Ratifying one transaction or act does not encompass multiple independent transactions undertaken at approximately the same time or during the same general course of conduct."). Only as to such calls might Plaintiff plausibly demonstrate ratification. *Id.* Plaintiff has offered no explanation as to how he can prove which calls eXp accepted the benefit of on a classwide basis—and no such path exists.  Mini-trials surrounding "benefit" from phone calls will surely swamp common issues—so certification must be denied.

        **e.**      **Individualized Assessment of a Class Member's Desire to Receive the Text or Call Is Necessary to Assess Class Member Claims**

Plaintiff cannot represent class members at trial that lack Article III standing to pursue their claims. As the Eleventh Circuit recently held in *Cordoba v. DIRECTV, LLC*, -- F.3d --, No. 18-

---

[12] Even this is untrue. eXp only accepts a commission for a limited number of transactions per year per agent. *See*, *e.g.*, Nuth Depo., at p. 27 ("[eXp] take[s] 20 percent until the agent has paid in $16,000, which is a cap, and then the agent gets 100 percent of the commission, less fees.").

12077, 2019 U.S. App. LEXIS 34146, at *24-26 (11th Cir. Nov. 15, 2019), unnamed class members who did not suffer an injury in fact traceable to defendant's conduct lack standing. The court went on to hold that "the district court will have to determine whether each of the absent class members has standing before they could be granted any relief," which "is an individualized issue." *Id.* at *31. That is because "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) (Roberts, J, Alito, S, concurring). "[I]f there is no way to ensure that the jury's damages award goes only to injured class members, that award cannot stand." *Id*. at 1053.

Here, virtually all of the putative class members with viable claims against eXp will lack standing because eXp will have only benefited from calls to class members that actually resulted in a sale.  Yet class members that responded positively to supposed "cold calls" and enlisted a non-party realtor's services are the least likely to have felt subjectively wronged by the calls at issue. They plainly were interested in the calls and the services being offered by agents as the calls ultimately resulted in the consumer signing up for eXp's services.

Thus Plaintiff is two steps removed from showing standing here. First, virtually all of the class members with viable claims *wanted* the calls at issue. Thus, under *Cordoba*, the class is simply uncertifiable. *Cordoba*, 2019 U.S. app. LEXIS 34146 at *20-21. Additionally, even if the phone calls were  "unwanted," because calls to cell phones do not necessarily cause Article III harm, the unnamed class member would still have to show an actual injury – not just a procedural violation – to have standing. *Salcedo*, 936 F.3d at 1169-72.

### 2.      Members of the Proposed Class—Especially Those That Were Actually Harmed—Are Not Ascertainable

"Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is 'adequately defined and clearly

ascertainable.'" *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)). In the Eleventh Circuit, ascertainability requires an "administratively feasible" way to identify class members with valid claims. *Karhu v. Vital Pharms., Inc.*, 621 F. App'x 945, 947-48 (11th Cir. 2015) ("[A] class is not ascertainable unless the class definition contains objective criteria that allow for class members to be identified in an administratively feasible way") (unpublished).

This class is not ascertainable for several reasons. First Plaintiff only supplied a sliver of the relevant class data – Mojo lead lists and dialing records relevant to only one of over 22,000 non-party realtors, Linda Mieckowski – and limited call logs from Vulcan 7. (Dkt. No. 66, p. 2.) Plaintiff, however, seeks to certify a class of calls placed by over 22,000 non-party realtors, not a single realtors, and across multiple lead lists and platforms. Yet Plaintiff has no data regarding the vast number of these purported class members and has made no showing as to how they can be identified. Indeed, Plaintiff has not even shown that the data he produced is representative of the data that would be available across the class for the over 22,000 non-party realtors for whom he has not presented data. Plaintiff has therefore failed to carry his burden of showing ascertainability on a classwide basis. *Karhu v. Vital Pharm., Inc.,* 621 F. App'x 945, 948 (11th Cir. 2015) (affirming denial of class certification because plaintiff did not establish existence of records that could be used to ascertain the entire class).

Even if Plaintiff could get past the abject failure to produce records, however, he still fails ascertainability because his proposed method, that of Anya Verkhovskaya, cannot reliably identify unnamed class members. *See*, *e.g.*, Woolfson Expert Report, at ¶ 7. As Mr. Woolfson pointed out, LexisNexis does not have a product intended to be used to identify unnamed class members. *Id.* ¶ 10. And because Plaintiff's expert "blindly" relies on third-party databases, there is no way to test

her methodology. *Id.* ¶¶ 35-40. In any event, however, it is impossible to actually identify the then-user – or even the then-subcriber – of a particular telephone over a four year period. *Id.* ¶¶ 46-115.

Ms. Verkhovskaya also demonstrated that her methodology has no scientific or statistical basis, and that – frankly – she does not even understand how her own methodology even works. She testified repeatedly that she has never subjected her methodology to statistically significant testing and does not even know the SQL query she supposedly uses to search a third-party's database. (Verkhovskaya Dep. pp. 18-19; 24-25.) Indeed, she testified that if her methodology presents competing results, she simply mails claim forms to every individual identified by it. (*Id.* p. 48-49) Her testimony is therefore the subject of a to-be-filed motion to strike, and does not establish that the class is ascertainable. And how could she? *She does not even know the source of the data she supposedly could use to ascertain class members*. (*Id.* pp. 15-16.) She also has a conflict of interest, as she will serve as both a Plaintiff's expert and class administrator – creating an obvious financial incentive to claim that a class is ascertainable and certifiable. (*Id.* pp. 11-14.)

## V.  <u>CONCLUSION</u>

As shown above, Plaintiff has failed to show that any Rule 23(a) or Rule 23(b)(3) factor has been met. Plaintiff has taken his certification bid. Accordingly, the Motion to Certify the Class and Appoint Class Counsel should be denied, *with prejudice*.

Date:  November 22, 2019                    Respectfully submitted,

                                           */s/ Jason Daniel Joffe*
                                           Jason Daniel Joffe
                                           Florida Bar No. 13564
                                           **SQUIRE PATTON BOGGS (US) LLP**
                                           200 S. Biscayne Blvd., Suite 4700
                                           Miami, FL 33131
                                           Telephone:  (305) 577-7000
                                           Facsimile:   (305) 577-7001
                                           Email:  jason.joffe@squirepb.com

                                           *Attorneys for Defendant eXp Realty, LLC*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on November 22, 2019, a copy of the foregoing was filed electronically with the above-captioned court, with notice of the filing being generated and sent electronically by the Court's CM/ECF system to all counsel of record.

*/s/ Jason D. Joffe*
Jason D. Joffe
