UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

**EDWIN DIAZ**, individually, and on behalf of
all others similarly situated,

        Plaintiff,

        Case No. 6:18-CV-01851-PGB-EJK

  v.

**EXP REALTY, LLC,**

        Defendant.

# Economic Assessment of the Value of Remedial Relief in Connection with Class Action Settlement Agreement

**July 8, 2022**

**Prepared by**

**Jon Haghayeghi, Ph.D.**

J. Herbert Burkman & Associates
1215 5th St.
Juneau, AK 99824

jon@burkmaneconomics.com

# ECONOMIC ASSESSMENT OF THE VALUE OF REMEDIAL RELIEF

## I. Introduction

This class action lawsuit alleges that eXp Realty ("Defendant") violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA") by promoting that non-employee real estate agents make unsolicited telemarketing calls, including prerecorded voice calls. Subsequently, a class action settlement was reached on behalf of all persons in the United States, who four years prior to the filing of this action through class certification (1) one or more eXp realtors called on their cell phone, (2) using a Mojo dialer or Vulcan7 dialer, (3) resulting in a disposition of 'Drop Message' if using the Mojo dialer or a disposition of 'Voicemail' if using the Vulcan7 Dialer, and (4) for whom the lead source for the call is identified as either Mojo, Vulcan7, or Landvoice. Class members include individuals who received a prerecorded call from an eXp-affiliated real estate agent and whose names and cell phone numbers appeared on calling records in the lawsuit. As part of the Settlement, the Defendant has agreed to remedial relief, including specifically to remove from its internal cloud-based platform for affiliated realtors training and instructional materials relating to cold call telemarketing, and to provide additional materials to its realtors concerning the requirements of the TCPA and other telemarketing laws and how to comply with them. To enact these changes in business practices, Defendant has established an agent compliance committee that is responsible for generating the compliance materials and taking corrective action as to realtors who fail to comply with Defendant's policies and federal and state laws restricting telemarketing.

The undersigned economist, Jon Haghayeghi, Ph.D., has been retained by class counsel to assess (the "Assessment") the benefits accruing to class members and to society from the remedial relief that the Settlement Agreement provides. The Assessment includes reviewing, analyzing, and evaluating the economic impact of the Settlement Agreement, and identifying the net benefits conferred on members of the class. Additionally, the Assessment identifies other positive externalities inuring to the favor of non-party beneficiaries and related parties. The Assessment measures the aggregate economic value of the Settlement to class members and society against the backdrop of conventionally accepted measurement methodologies extant within the discipline of economics and its sub-field, cost-benefit analysis.

It is noteworthy that the Assessment's quantitative analysis includes the monetized value of non-monetary remedial relief inherent in the Settlement

Agreement. By agreeing to change its practices to avoid non-compliance with the TCPA, Defendant eXp Realty, LLC has set in motion a series of positive benefits that may be readily valued for a broad swath of society. In summary, the undersigned economist believes the Settlement Agreement has far-reaching societal effects that bestow positive economic externalities to parties beyond the scope of the Settlement Agreement.

## II.   QUALIFICATIONS

Dr. Haghayeghi joined J. Herbert Burkman & Associates economics consulting firm in 2009. He earned his bachelor's and master's degrees in Economics from Southern Methodist University, Dallas, Texas. In 2012, Dr. Haghayeghi represented the United States at the Institute for Studies on Economics and Employment, a conference hosted by Nobel Laureates in Economics in Iseo, Italy. He earned his Ph.D. in economics in 2017 from the Department of Economics, Claremont Graduate University, Claremont, California. Dr. Haghayeghi wrote his dissertation on weak-form efficiency in U.S. equity markets under the guidance of Dr. John Rutledge. Throughout his tenure in his doctoral program, he taught courses at California State Polytechnical University in the Department of Finance, Real Estate, and Law, Pomona, California.

Dr. Haghayeghi has taught at Loyola Marymount University, Department of Economics, Los Angeles, California. He has also taught valuation seminars in Las Vegas, San Diego, and Chicago in 2014, 2017, and 2021 respectively, to members of the American Rehabilitation Economics Association on calculating economic damages. Dr. Haghayeghi served as the Executive Director of the State of Alaska's Commercial Fisheries Entry Commission from 2019 to 2022, and currently serves as the Executive Director of the State of Alaska's Commission on Aging. Dr. Haghayeghi has produced several reports valuing remedial relief regarding violations of the Telephone Consumer Protection Act that have been accepted in both State and Federal Courts.

### III.     ECONOMICS OF THE SETTLEMENT AGREEMENT

**A.     Assessing the Economic Value of the Settlement Agreement**

As noted in the introduction, the discipline of economics provides the theoretical framework and quantitative methods central to assessing the benefits accruing to all persons affected by the Settlement Agreement. With respect to the Settlement, review and analysis have identified the benefits inuring to the class and a broad spectrum of society.

*1. Economic Benefits*

The primary economic benefit to consumers is the value provided by a change in eXp Realty, LLC's behavior and the resulting change in non-employee realtors' behavior. Making business changes to cease the calling conduct assures all current and future targeted consumers will not experience interference of their privacy from telemarketing calls by eXp Realty, LLC agents. In this matter, the Settlement Agreement assures privacy to the public from telephone calls on behalf of eXp Realty, LLC. At the same time, modified practices assure eXp Realty, LLC that in the future consumers may not challenge its telemarketing practices. The revision of practice has three broad categories of beneficiaries, including 1) targeted consumers, 2) eXp Realty, LLC, and 3) society in general. The revisions to eXp Realty's practices ensure privacy to consumers and relief of displeasure. It is understood that the pre-class action lawsuit status quo has been permanently altered. Future targeted consumers will never need to be concerned with the diminishment of privacy and pleasure at any time. Society is likely spared the need to relieve any future party that experiences damages.

*2. Determining Willingness-to-Pay*

To determine a reasonable aggregate value of the relief brought about by the Settlement Agreement, economists rely on the methods and procedures established in the discipline of economics and its sub-field, cost-benefit analysis (CBA). In assessing benefits, cost-benefit analysts routinely rely on consumers' ***willingness-to-pay*** to gain knowledge and/or remove an undesired feature impacting consumer satisfaction derived through a purchase. The willingness-to-pay methodology allows the direct assessment of a range of reasonable choices and economists identify value associated with each choice. In this assessment, both empirical data (subscription products available in the marketplace) and theoretical data are available on individual willingness-to-pay for telephone privacy.

### 3. *Valuing Privacy and the Absence of Telemarketing Calls*

As with all decisions to spend on goods and services, consumers seek to maximize their satisfaction, or utility, through their purchases. Relatedly, in their selection and purchase of any good or service, consumers exhibit a willingness-to-pay for the absence of an undesired feature. CBA allows economists to measure and then place a value on benefits that derive from how much consumers are willing-to-pay for the absence of an undesired feature, or in this case, the forbiddance of unsolicited telemarketing calls. With reference to the mentioned practices of eXp Realty's agents, any phone call made *implies* displeasure and denial of privacy. What value does the absence of an undesired feature have for consumers and does a market exist for such a product?

### 4. *Determining Value and Benefit*

Value is most readily and routinely observed through the study of consumer behavior with respect to TCPA. Willingness-to-pay reveals a range of reasonable values representing the diversity of consumer preferences over varying periods of time.[1] Products used by millions of Americans which were designed to stop unwanted telemarketing/spam calls range in price from $1.99 to $3.99 per month. The Settlement Agreement, much like these products, assist in the removal of this specific undesired feature. The known market value of such products serves to assess the economic benefit bestowed on each class member and society as a result of the Settlement Agreement.[2]

In summary, it is the opinion of the undersigned economist, developed with a reasonable degree of economic certainty, that the estimates in this report are conservatively low. It should be noted, this analysis follows the broad assessment guidelines established by applicable economic theory and empirical analysis in determining the economic value. As reviewed above, the broad foundations of microeconomic theory and cost-benefit analysis are drawn upon to assess the reasonable value of the reformed and modified business practices and initiatives acknowledged in the parties' Settlement Agreement.

### B.    Correcting Market Externalities

Before briefly outlining this report's conclusions, it is useful to identify the manner in which economics provides the framework for valuation undertakings. By definition, economics is the study of how society values its resources.  Economists widely agree that a society's resources—naturally

---

[1] Png, Ivan P. L., On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry (June 2007).
[2] With the range of prices presented in Appendix 1, Table 1, Table 1.A, Table 1.B, Table 1.C, and Table 2, Table 2.A, Table 2.B, and Table 2.C, the undersigned economist has relied on federal government-collected telephone number assignment data and peer-reviewed research on value of privacy to assess societal value of the remedial relief.

occurring, human, and capital—are valued by a combination of their usefulness, their abundance or scarcity and prevailing supply and demand conditions. Ultimately, the value of a resource is reflected in its price. Natural resources— the earth's bounty of land, minerals, and water, to name a few naturally-occurring resources—are valued by the dollars spent to bring them to market, where supply conditions meet demand. Capital, often referred to as man-made means of production, is valued by its role in transforming natural resources into usable final goods and services. Finally, labor—the human resource—is valued by its ability to work with capital and natural resources in delivering a product with timely and efficient effort.

In assessing the value of a resource, economists rely on facts, assumptions, and forecasts. In those rare instances when the basic facts are known and generally agreed upon, economic assessment is often straightforward. When basic facts are subject to interpretation and conflict, analysis and review are critical. When forecasts become part of the equation, any number of conflicting interpretations may arise. Assessment proceeds with the recognition that underlying premises, assumptions, and expectations are often controversial. As a result, the undersigned economist is behooved to present associated benefits to society at several available price levels and over multiple time horizons.

1. ***Statutory Value of Privacy***

In evaluating the reasonableness of those price levels, it is important to note the legislative history and statutory language of any public policy that may be relevant when considering the societal benefit resulting from the enactment of the public policy. With respect to the TCPA, Congress acknowledges prospective gains in societal benefit by prohibiting non-consensual telephone solicitations when it provided for the recovery of actual monetary loss or statutory damages in the amount of $500 for each such violation, whichever is greater. In the case of willful violations, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times $500, or $1,500.[3] And certainly, there are members of the class who value such protection in the amount of $500 dollars or more. Assuming that consumers outside the scope of the Settlement Agreement place the maximum statutory value on being protected from or for acquiescing to receipt of such non-consensual calls, the gains in societal benefit from the agreed-to remedial relief are substantial.

---

[3] 47 U.S.C. § 227

### 2. Basis for Assessed Value of Benefit to Society

In this assessment, a more conservative, market-based approach is pursued by utilizing products available to consumers. In 2015, Harvard University students won a grand prize in the Federal Trade Commission's contest aimed at promoting technologies to block and defeat the scourge of automated telemarketing systems.[4] The recipients of this award developed the most widely adopted application for blocking unwanted telephone calls in the United States for $3.99 per month. With more than 12 million downloads and $400 million in losses prevented,[5] RoboKiller is the leading independent spam call and text blocker. Subscriptions to other products, such as Verizon Call Filter and Hiya App cost $2.99 per month and are used by millions of customers in the United States. The prevalence of unwanted telemarketing calls has demonstrated there is a clear willingness-to-pay for services that eliminate undesired, unsolicited telemarketing calls.

### 3. Value of the Benefit to Society

#### a. Change in eXp practices with non-employee real estate agents

Under the Settlement Agreement, eXp Realty has agreed to remove from its internal cloud-based platform for affiliated realtors training and instructional materials relating to cold call telemarketing, and to provide additional materials to its realtors concerning the requirements of the TCPA and other telemarketing laws and how to comply with them. To enact these changes in business practices, eXp Realty has established an agent compliance committee that is responsible for generating the compliance materials and taking corrective action as to realtors who fail to comply with eXp Realty's policies and federal and state laws restricting telemarketing.. These changes are expected to reduce the number of unsolicited calls that are transmitted annually by eXp affiliated agents. In determining the economic value of the benefits to society, the undersigned economist recognizes the role the Settlement Agreement plays in deterring future TCPA violations.

#### b. Estimating Average Call Frequency and Volume

Essential to determining the economic benefits of the Settlement Agreement is understanding the call statistics during the class period. To develop this understanding, call logs during the class period were reviewed and standardized for purposes of forecasting averages into the future.

---

[4] https://www.ftc.gov/news-events/news/press-releases/2015/08/ftc-awards-25000-top-cash-prize-contest-winning-mobile-app-blocks-illegal-robocalls

[5] https://www.bloomberg.com/press-releases/2022-06-08/spam-text-messages-reach-11-9-billion-the-highest-level-to-date

Call data indicates that nearly 400 eXp realtors made approximately 300,000 prerecorded calls to class member cell phones using leads from Mojo, Vulcan7, or Landvoice. When factoring landlines, approximately 400,000 prerecorded calls were transmitted by eXp realtors. The average realtor duration of the made calls using the Mojo and Vulcan7 dialers for approximately 500 days while affiliated with eXp with an average of 1,035 telemarketing calls per realtor. This implied an average number of 757 prerecorded calls per year per realtor.

The prerecorded call data above represents a small portion of total outgoing calls, as traditional telemarketing calls were also made by these and other realtors. The records produced to Plaintiffs' counsel by one of the realtors that called the Representative Plaintiff, Linda M., reveal the percent of total calls that were prerecorded calls. Records indicate that 9,101 calls were transmitted by Linda M., of which 971 were prerecorded, implying a 10.6% prerecord message rate. Holding this ratio constant, the average realtor would make approximately 7,100 total calls per year using purchased leads from Mojo, Vulcan7 or Landvoice. Aggregated realtor calling data from Mojo for over 4,000 realtors demonstrates that approximately 75% of the calls by realtors to the most subscribed to purchased leads services are made to leads from Mojo, Vulcan7, and Landvoice. The remaining 25% of calls are made to leads purchased from substantially similar lead services, including specifically RedX, Cole Information, and Data Concierge Services.[6] Assuming the average realtor makes a similar proportion of calls to each set of lead sources, the average realtor would make approximately 9,466 total calls per year using Mojo or Vulcan7 to a lead from Mojo, Vulcan7, Landvoice, RedX, Cole Information, and Data Concierge Services. This is a conservative estimate.[7]

### c. Estimating Employment and Utilization

With recognition that not all eXp realtors are engaged in telemarketing, and that eXp LLC's growth as a company was parabolic during and since the class period, the undersigned economist must determine the proportion of eXp realtors that were engaged in telemarketing to estimate of the number of agents

---

[6] Declaration of Mojo, *St. John v. Keller Williams Realty, Inc.*, No. 6:19-cv-01347-PGB-DCI, ECF 95-74 (M.D. Fla.).

[7] A reasonableness check was performed to ensure the conclusions presented herein are appropriate and sensible given the facts made available to the undersigned economist. According to the declaration of Mojo in a similar matter involving similar brokerage and realtor conduct, call records indicate that a total of 4,046 real estate agents made 213,684,006 calls using Mojo over 6.4 years. This averages to 8,252 calls per realtor per year, of which, an average of 3,096 calls were made to leads from Mojo, Vulcan7, Landvoice . However, it is unreasonable to assume that each of the realtors used the Mojo dialer for the entirety of the 6.4 year period. If, instead, we assume the realtors used the dialing service for approximately 1.36 years, similar to eXp realtors, the result would be 38,604 calls per realtor per year, which would include 14,484 to the 6 lead sources. When the comparing average aggregate number of calls per agent, the conclusions drawn regarding eXp's expected future calling conduct are conservative.

engaged in telemarketing and associated total number of telemarketing calls expected per year.

During the class period, eXp agent count grew from 250 to more than 80,000 individuals.[8] Based on available data, the weighted average number of realtors during the class period was approximately 16,000, of which, approximately 400 made calls to the class, or 2.5% of realtors violated the TCPA. As eXp has grown to 80,000 non-employee real estate agents, at a 2.5% rate of violation, the proportional number of realtors is 2,000 agents, which would generate approximately 18,932,000 unsolicited calls or prerecorded messages using Mojo or Vulcan7 to one of the six lead sources per year, which would be approximately 94,660,000 calls over a five-year period assuming no growth from eXp's current size.

### d. *Estimating the Compliance Rate*

It would be unfair to assume that the Settlement Agreement would result in 100% compliance from eXp's non-employee realtors. It is understood that in accordance with the settlement agreement eXp has already (1) removed from its internal cloud-based platform for affiliated realtors training and instructional materials relating to cold call telemarketing, (2) provided additional materials to its realtors concerning the requirements of the TCPA and other telemarketing laws and how to comply with them, and (3) established an agent compliance committee that is responsible for generating the compliance materials and taking corrective action as to realtors who fail to comply with eXp's policies and federal and state laws restricting telemarketing.

The question then becomes, what percentage of eXp realtors will cease telemarketing activities as a result of the Settlement Agreement? An issue facing the agents is that eXp Realty has in the past communicated to them that they should remain compliant with telemarketing laws, but at the same time, eXp has also provided them training materials that encouraged violations of the TCPA and other telemarketing laws, and otherwise not enforced its own policies relating to telemarketing. As a result, it is likely that many eXp realtors need to be told how to remain lawful with respect to the TCPA and other telemarketing laws and will have no intention of violating the law, particularly post-settlement, once they have been. How successful will the Settlement Agreement be in changing realtor behavior?

A 1,200-hour study conducted by the Department of Justice provides insight regarding the rate at which individuals, regardless of intent, demonstrate

---

[8] https://life.exprealty.com/exp-realty-timeline

compliance in correcting known or unknown unlawful behavior.[9] In this study, field researchers studied trends when verbal requests were made by police officers to citizens, which found that people are generally compliant when expressly requested to take particular corrective action to comply with the law. One of the three major categories in this study was asking "leaving a person alone or leaving the premises." The other two categories included "discontinuing illegal behavior" and "ceasing disorderly conduct." All three categories evaluated in this study are similar to the intrusive/illegal/unsolicited aspects of telemarketing that motivate the TCPA. Out of 1,627 encounters included in the study, 78% of citizens made choices in compliance with the requests for corrective action after already engaging in behavior that they knew or should have known was illegal. Consequently, it is reasonable to assume a significant number of calls will be avoided as a result of the changes to eXp's business practices consisting of express requests to cease particular unlawful behavior and a mechanism for enforcing these requests. By applying this 78% compliance rate to the 94,660,000, the adjusted figure reduces to 73,834,800 calls that will be prevented as a result of eXp's changes in business practices.

### d. *Estimating Willingness-to-Pay to Avoid One Call*

The average price of a product presented in section B.2. and Appendix 1 available to consumers seeking to prevent telemarketing calls was $2.99 per month. According to the June 2022 Nationwide Robocall Data – from robocall tracker Robocall Index, the number of robocalls received per person in the United States was 13.2 during the month of June.[10] Therefore, for the various consumer products available the price paid to avoid one call can be calculated as follows:

$$\text{Implied Price Per Call Avoided} = \frac{\$1.99}{13.2} = \$.1658 \text{ per call}$$

$$\text{Implied Price Per Call Avoided} = \frac{\$2.99}{13.2} = \$.2265 \text{ per call}$$

$$\text{Implied Price Per Call Avoided} = \frac{\$3.99}{13.2} = \$.3023 \text{ per call}$$

---

[9] Author(s) S D Mastrofski; J B Snipes; A E Supina. "Compliance on Demand: The Public's Response to Specific Police Requests." *Office of Justice Programs*, https://www.ojp.gov

[10] "Youmail Robocall Index: June 2022 Nationwide Robocall Data." *Robocall Index | YouMail*, https://robocallindex.com/.

### e. *Estimating the Value of the Benefit to Society*

Based on the calculations in the preceding sections, we can infer the value of the benefit to society using willingness to pay price points ranging from $1.99 per month to $3.99 per month.

- At a $1.99 price point, the estimated benefit to society over the next five years is $11,368,798.

- At a $2.99 price point, the estimated benefit to society over the next five years is $17,081,762.

- At a $3.99 price point, the estimated benefit to society over the next five years is $22,794,726.

Table 1 in Appendix 2 summarizes these values range from a minimum of $0.55 to a maximum of $98.33.[11] Each value represents a willingness-to-pay for the benefit of not receiving unwanted cell phone calls. It is from values in this table that we derive our best estimate of the present value of the post-settlement remedial relief, using the most commonly observed willing-buyer-price-points. With the recognition that there are short-term and long-term benefits associated with remedial relief delivered by the Settlement Agreement, the undersigned economist has calculated annual values for for the next five years at three price levels referenced in Appendix 2. The central measure presented in the scenario analysis Table 1 shows a benefit of **$17,081,672** at a willingness-to-pay of $2.99 per month (or $.2265 per call).

---

[11] The sources of all values are provided in Appendix 2.

11

## IV. CONCLUSION

By accounting for the anticipated compliance rate of eXp realtors engaged in telemarketing based on the changes to eXp's practices aimed at curbing telemarketing law violations, and the range of consumer willingness-to-pay price points to avoid a call, we are able to estimate on an annual basis the total value of the benefit to society resulting from the Settlement Agreement. As reviewed herein, it is my opinion—held with reasonable economic certainty—that the economic value of the benefits bestowed on society is between **$2,448,854 and $4,910,014** per year, and over a five-year period, the associated present value of future benefits to society is between **$11,368,798** and **$22,794,726.**

In closing this report, the undersigned economist is available to respond to any question raised about the methods and procedures used in reaching the conclusions herein.

The above-cited appendices follow.

Jon Haghayeghi, Ph.D.

**APPENDICES**

# APPENDIX 1

# VALUING REMEDIAL RELIEF

TABLE 1

SUMMARY TABLE

PRESENT VALUE OF REMEDIAL RELIEF FOR INDIVIDUALS IMPACTED BY EXP REALTY, LLC
2022 TO 2026

EDWIN DIAZ, individually, and on behalf of all others similarly situated
v.
EXP REALTY, LLC

Case No. 6:18-CV-01851-PGB-EJK, United States District Court for the Middle District of Florida

| Number of individuals benefitting from the absence of undesired phone calls | | Aggregate Present Value of Injunctive Relief from Non-Consensual Telemarketing Calls with Market Based Market Based Willingness-to-Pay Methodology and Prices Ranging from $23.88 to $47.88 annually | | | | | |
|---|---|---|---|---|---|---|---|
| | | $23.88/ year $1.99 / month ($.17 / call) | | $35.88 / year $2.99 /month ($.25 / call) | | $47.88 / year $3.99 / month ($.33 / call) | |
| 5 years (2022 to 2027), expected number of non consensual telemarketing calls avoided | 73,834,800 | $11,368,798 | [1] | $17,081,762 | [2] | $22,794,726 | [3] |

[1] See Table 1.A., Column 7.
[2] See Table 1.B., Column 7.
[3] See Table 1.C., Column 7.

14

TABLE 2.A

PRESENT VALUE OF REMEDIAL RELIEF

SCENARIO 1: VALUE OF AVOIDING UNWANTED TELEMARKETER PHONE CALLS

EDWIN DIAZ, individually, and on behalf of all others similarly situated
v.
EXP REALTY, LLC

CASE NO.: 6:18-CV-01851-PGB-TBS, United States District Court for the Middle District of Florida

| | COL 1 YEAR | COL 2 NUMBER OF CALLS (#) | | COL 3 VALUE OF BENEFIT OF AVOIDING CALL ($1.99 per month) (#) | | COL 4 EXPECTED VALUE OF BENEFIT TO CONSUMERS ($) | COL 5 DISCOUNT FACTOR ($) | | COL 6 PRESENT VALUE OF EXPECTED BENEFIT COL 5 / COL 6 ($) | COL 7 CUMULATIVE PRESENT VALUE OF EXPECTED BENEFIT ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 2022 | 7,120,507 | | 0.17 | | 1,180,817 | 1.000 | [4] | 1,180,817 | 1,180,817 |
| 1 | 2023 | 14,766,960 | [1] | 0.17 | [3] | 2,448,854 | 1.029 | | 2,380,533 | 3,561,350 |
| 2 | 2024 | 14,766,960 | | 0.17 | | 2,448,854 | 1.062 | | 2,306,936 | 5,868,286 |
| 3 | 2025 | 14,766,960 | | 0.17 | | 2,448,854 | 1.094 | | 2,237,788 | 8,106,074 |
| 4 | 2026 | 14,766,960 | | 0.17 | | 2,448,854 | 1.128 | | 2,171,556 | 10,277,630... |
| 5 | 2027 | 7,646,453 | [2] | 0.17 | | 1,268,037 | 1.162 | | 1,091,169 | 9,197,243 |
| | Total | 73,834,800 | | | | 12,244,271 | | | 11,368,798 | |

Note: row 4 shows 8,039,842 as cumulative.

[1] This model assumes that 14,174,720 calls will be made per year. The start date of this analysis is July 8, 2022.
[2] This model terminates July 7, 2027, or after five years.
[3] This model assumes that the willingness-to-pay to avoid an undesired call is approximately $.17.
[4] Factors in this column are based on yields on U.S. Treasury Securities as of July 7, 2022.

15

TABLE 2.B

PRESENT VALUE OF REMEDIAL RELIEF

SCENARIO 2: VALUE OF AVOIDING UNWANTED TELEMARKETER PHONE CALLS

EDWIN DIAZ, individually, and on behalf of all others similarly situated

v.

EXP REALTY, LLC

CASE NO.: 6:18-CV-01851-PGB-TBS, United States District Court for the Middle District of Florida

|   | COL 1 YEAR | COL 2 NUMBER OF CALLS | | COL 3 VALUE OF BENEFIT OF AVOIDING CALL ($2.99 per month) | | COL 4 EXPECTED VALUE OF BENEFIT TO CONSUMERS | COL 5 DISCOUNT FACTOR | | COL 6 PRESENT VALUE OF EXPECTED BENEFIT COL 5 / COL 6 | COL 7 CUMULATIVE PRESENT VALUE OF EXPECTED BENEFIT |
|---|---|---|---|---|---|---|---|---|---|---|
|   |   | (#) | | (#) | | ($) | ($) | | ($) | ($) |
| 0 | 2022 | 7,120,507 | [1] | 0.25 | [3] | 1,774,193 | 1.000 | [4] | 1,774,193 | 1,774,193 |
| 1 | 2023 | 14,766,960 | | 0.25 | | 3,679,434 | 1.029 | | 3,576,781 | 5,350,974 |
| 2 | 2024 | 14,766,960 | | 0.25 | | 3,679,434 | 1.062 | | 3,466,200 | 8,817,174 |
| 3 | 2025 | 14,766,960 | | 0.25 | | 3,679,434 | 1.094 | | 3,362,305 | 12,179,478 |
| 4 | 2026 | 14,766,960 | | 0.25 | | 3,679,434 | 1.128 | | 3,262,790 | 12,079,963 |
| 5 | 2027 | 7,646,453 | [2] | 0.25 | | 1,905,241 | 1.162 | | 1,639,495 | 13,818,973 |
|   | Total | 73,834,800 | | | | 18,397,171 | | | 17,081,762 | |

[1] This model assumes that 14,174,720 calls will be made per year. The start date of this analysis is July 8, 2022.
[2] This model terminates July 7, 2027, or after five years.
[3] This model assumes that the willingness-to-pay to avoid an undesired call is approximately $.25.
[4] Factors in this column are based on yields on U.S. Treasury Securities as of July 7, 2022.

16

TABLE 2.C

PRESENT VALUE OF REMEDIAL RELIEF

SCENARIO 3: VALUE OF AVOIDING UNWANTED TELEMARKETER PHONE CALLS

EDWIN DIAZ, individually, and on behalf of all others similarly situated

v.

EXP REALTY, LLC

CASE NO.: 6:18-CV-01851-PGB-TBS, United States District Court for the Middle District of Florida

| | COL 1 | COL 2 | | COL 3 | | COL 4 | COL 5 | | COL 6 | COL 7 |
|---|---|---|---|---|---|---|---|---|---|---|
| | YEAR | NUMBER OF CALLS | | VALUE OF BENEFIT OF AVOIDING CALL ($3.99 per month) | | EXPECTED VALUE OF BENEFIT TO CONSUMERS | DISCOUNT FACTOR | | PRESENT VALUE OF EXPECTED BENEFIT COL 5 / COL 6 | CUMULATIVE PRESENT VALUE OF EXPECTED BENEFIT |
| | | (#) | | (#) | | ($) | ($) | | ($) | ($) |
| 0 | 2022 | 7,120,507 | [1] | 0.33 | [3] | 2,367,568 | 1.000 | [4] | 2,367,568 | 2,367,568 |
| 1 | 2023 | 14,766,960 | | 0.33 | | 4,910,014 | 1.029 | | 4,773,028 | 7,140,597 |
| 2 | 2024 | 14,766,960 | | 0.33 | | 4,910,014 | 1.062 | | 4,625,464 | 11,766,061 |
| 3 | 2025 | 14,766,960 | | 0.33 | | 4,910,014 | 1.094 | | 4,486,821 | 16,252,882 |
| 4 | 2026 | 14,766,960 | | 0.33 | | 4,910,014 | 1.128 | | 4,354,023 | 16,120,085 |
| 5 | 2027 | 7,646,453 | [2] | 0.33 | | 2,542,446 | 1.162 | | 2,187,821 | 18,440,703 |
| | Total | 73,834,800 | | | | 24,550,071 | | | 22,794,726 | |

[1] This model assumes that 14,174,720 calls will be made per year. The start date of this analysis is July 8, 2022.

[2] This model terminates July 7, 2027, or after five years.

[3]This model assumes that the willingness-to-pay to avoid an undesired call is approximately $.33.

[4] Factors in this column are based on yields on U.S. Treasury Securities as of July 7, 2022.

17

**APPENDIX 2**

**SUPPORTING DOCUMENTS FOR VALUING WILLINGNESS-TO-PAY**

| | TABLE 1 |
|---|---|
| | **VALUE OF PROTECTION FROM NON-CONSENSUAL SURVEY CALLS: WILLING BUYER'S PRICE POINTS** |
| **PRICE PER YEAR** | **SOURCE / SUPPORT** |
| $0.55 | Varian et al.'s (2004) estimate ranged from $60 million to $3.6 billion a year. With 108.4 million households, this was equivalent to a range of **$0.55** to $33.21 per household per year. |
| $3.22 | Png, Ivan P. L., On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry (June 2007). Available at SSRN: https://ssrn.com/abstract=1000533 or http://dx.doi.org/10.2139/ssrn.1000533 |
| $8.25 | Png, Ivan P. L., On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry (June 2007). Available at SSRN: https://ssrn.com/abstract=1000533 or http://dx.doi.org/10.2139/ssrn.1000533 |
| $13.19 | Png, Ivan P. L., On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry (September 2007). The perceived value of the "do not call" registry to rangefrom $13.19 to $98.33 per household. The implied national gain inconsumer welfare (relative to the state level registries) ranged from $1.42 to $11.62 billion. |
| $23.88 | Nomorobo app charges **$1.99** per month for Robocall Blocking. https://play.google.com/store/apps/details?id=com.nomorobo&hl=en |
| $33.21 | Varian et al.'s (2004) estimate ranged from $60 million to $3.6 billion a year. With 108.4 million households, this was equivalent to a range of $0.55 to **$33.21** per household per year. |
| $35.88 | Hiya Charges Users **$2.99** per month to block calls via iOS app. https://blog.hiya.com/hiya-premium-providing-more-value-to-the-phone-experience/ |
| $35.88 | Verizon charges **$2.99** per month for its Call Filter. https://www.verizon.com/solutions-and-services/call-filter/ |
| $47.88 | Robokiller - Robocall Blocker charges **$3.99** per month to block spam calls. https://play.google.com/store/apps/details?id=com.robokiller.app&hl=en_US |
| $98.33 | Png, Ivan P. L., On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry (September 2007). The perceived value of the "do not call" registry to rangefrom $13.19 to $98.33 per household. The implied national gain inconsumer welfare (relative to the state level registries) ranged from $1.42 to $11.62 billion. |
| | **Measures of Central Tendency:** |
| | Mean: $30.03 per year |
| | Median: $28.55 per year |